*1523*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 12-259 |
| | ) | |
| Plaintiff, | ) | Judge |
| | ) | |
| v. | ) | |
| | ) | Title 21, United States Code, Sections 846 |
| WILLIAM M. SADOWSKI, | ) | and 841(a)(1) |
| | ) | |
| Defendant. | ) | |
| | ) | |

## INFORMATION

The United States Attorney Charges:

## COUNT 1

(Conspiracy to Distribute Controlled Substances - Anabolic Steroids)

1.      On a date unknown to the United States Attorney, but at least as early as from on or about March, 2007, and continuing through on or about March 21, 2011, in Pittsburgh, Pennsylvania, in the Western District of Pennsylvania, and elsewhere, Defendant WILLIAM M. SADOWSKI, John F. Gavin, and Physician 1 (not charged herein), knowingly and intentionally combined, conspired, confederated and agreed together and with each other, and with other persons known and unknown to the United States Attorney to possess with the intent to

distribute and distribute Schedule III controlled substances, including the anabolic steroids

Stanozolol, Nandrolone Decanoate, Testosterone Enanthate, Testosterone Suspension,

Testosterone Propionate, Oxandrolone, Testosterone Cypionate, and Testosterone, in violation of

Title 21, United States Code, Sections 846 and 841(a)(1).

GENERAL ALLEGATIONS

At all times material to this Information:

A.      The Controlled Substances Act

2.      The Controlled Substances Act ("CSA") governed the manufacture, distribution,

and dispensation of controlled substances in the United States. 21 U.S.C. §§ 801-971.

3.      Various prescription drugs were scheduled substances under the CSA. The CSA

scheduled controlled substances according to their potential for abuse or dependence, their

accepted medical use, and their accepted safety or use under medical supervision. 21 U.S.C. §

812(b). There were five schedules of controlled substances: Schedules I, II, III, IV, and V. Drugs

were scheduled into these levels based on their potential for abuse and physical and

psychological addiction. 21 U.S.C. § 812(a).  Schedule II drugs have a high potential for abuse

and abuse of these drugs may lead to severe psychological or physical dependence.  21 U.S.C. §

812(b)(2).  Schedule III drugs have a lower potential for abuse than Schedule II drugs, but abuse

of these drugs may lead to moderate to low physical dependence and high psychological

dependence. 21 U.S.C. § 812(b)(3).

4.      Anabolic steroids, such as the drugs Stanozolol, Nandrolone Decanoate,

Testosterone Enanthate, Testosterone Suspension, Testosterone Propionate, Oxandrolone,

Testosterone Cypionate, and Testosterone, were Schedule III controlled substances.

-2-

5.      A prescription for a controlled substance was effective only if it was issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. 21 C.F.R. § 1306.04(a).

B.      The Federal Food, Drug, and Cosmetic Act

6.      The U.S. Food and Drug Administration ("FDA") was the federal agency charged with the responsibility for protecting the health and safety of the American public by enforcing the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 et seq.  The FDA's responsibilities under the FDCA included regulating the manufacture, labeling, and distribution of all drugs and drug components shipped or received in interstate commerce.

7.      The FDCA prohibited the knowing distribution of, or possession with intent to distribute, human growth hormone ("HGH") for any use in humans other than the treatment of a disease or other recognized medical condition, where such use had been authorized by the Secretary of Health and Human Services under 21 U.S.C. § 355, and was pursuant to the order of a physician. 21 U.S.C.§ 333(e).

8.      The Secretary had not, pursuant to 21 U.S.C. § 355, authorized the use of HGH for anti-aging, body building, or athletic performance enhancement purposes.

9.      Omnitrope, Genotropin, Somatropin, Norditropin, and Tev-Tropin were HGH.

C.      ANEWrx

10.     ANEWrx was a pharmacy located in Pittsburgh, Pennsylvania.  ANEWrx filled prescriptions for controlled and non-controlled substances. ANEWrx is licensed in Pennsylvania and at least 44 additional states to dispense drugs requiring prescriptions and was registered by the DEA to dispense Schedule III controlled substances - like Stanozolol, Nandrolone

Decanoate, Testosterone Enanthate, Testosterone Suspension, Testosterone Propionate,

Oxandrolone, Testosterone Cypionate, and Testosterone. ANEWrx also dispensed

non-controlled prescription drugs, such as HGH, Chorionic Gonadotropin ("HCG"), Sermorelin,

Anastrozole, and Tamoxifen.

11.     WILLIAM SADOWSKI was the President and co-owner of ANEWrx.

SADOWSKI later transferred his co-ownership of ANEWrx to a trust owned exclusively by a

family member. SADOWSKI was a pharmacist licensed to practice in Pennsylvania, and

authorized by that state to dispense drugs pursuant to a valid prescription.

12.     John F. Gavin was a registered nurse who was employed at ANEWrx from March

29, 2010 through April, 2011. Gavin was employed as a consultant for ANEWrx and performed

research on hormone replacement therapy, including researching the status of criminal

prosecutions across the country for the illegal distribution of anabolic steroids and HGH.

13.     ANEWrx developed business relationships with numerous physicians and clinics

that promoted the use of steroids, HGH, and other prescription drugs for anti-aging, body

building, and/or athletic performance enhancement.

D.     Use of Anabolic Steroids, HGH, and Other Prescription Drugs

14.     Some of the anabolic steroids and HGH were part of a "stack" or drug cocktail

that included other prescription drugs like HCG, Tamoxifen, and Anastrozole. "Stacking"

is the practice of combining anabolic steroids, HGH, and other prescription drugs for a

period ranging from 6 to 12 weeks, or longer.

15.     HGH was included in the "stack" to promote muscle growth and leanness.

HCG was included in the "stack" to stimulate testosterone production in the testes. HCG

was commonly used as part of the anabolic steroid cycles to maintain and restore testicular size and natural testosterone production, which often diminished as a result of the use of the anabolic steroids.

16.     Other prescription drugs distributed, dispensed, and sold to customers included the following estrogen blockers or anti-estrogen drugs: Tamoxifen and Anastrozole. These drugs were included in the "stack" to prevent numerous negative side effects of taking anabolic steroids, including gynecomastia, the painful enlargement of male users' breasts. When used legitimately, Tamoxifen and Anastrozole are used to treat various forms of breast cancer and to prevent recurrence of cancer after surgery or chemotherapy.

17.     Physician 1 was a medical doctor licensed to practice and DEA-registered to prescribe controlled substances in the State of Pennsylvania.  He operated a health center in Pittsburgh, Pennsylvania at all times relevant to this indictment.

## OBJECT OF THE CONSPIRACY

18.     It was the purpose and object of the conspiracy for the defendants and their co-conspirators to unjustly enrich themselves by causing the distribution in interstate commerce of anabolic steroids and HGH for unauthorized uses such as anti-aging, body building, and athletic performance enhancement.

## MANNER AND MEANS

19.     The manner and means employed by the defendants to effect the objects of the conspiracy included the following:

a.     It was part of the conspiracy that in early 2007, SADOWSKI met with Physician 1 to establish a business relationship between ANEWrx and Physician 1 for

-5-

compounded products. Physician 1 told SADOWSKI that he wanted to get paid for prescribing HGH, anabolic steroids, thyroid products, topical creams, and bio-identical hormone replacement products to patients. SADOWSKI then provided Physician 1 with a list, detailing ANEWrx's price for each prescription. SADOWSKI and Physician 1 then agreed to mark-up the price to Physician 1's patients and that SADOWSKI would kickback the additional funds to Physician 1.

b. Thereafter, it was further part of the conspiracy that Physician 1 referred the vast majority of patients to ANEWrx to receive certain compounded pharmaceutical products.

c. It was further part of the conspiracy that ANEWrx maintained monthly billing reports documenting the names of patients referred by Physician 1; the corresponding prescriptions from Physician 1 for various compounded products; the amount of prescription products dispensed, including anabolic steroids and HGH; the price ANEWrx charged Physician 1; the amount the patient paid for the product; and the amount of commission or profit due back to Physician 1.

d. It was further part of the conspiracy that Physician 1 was paid monthly by ANEWrx for the mark-up Physician 1 placed on prescriptions for patients. Between January 1, 2008, and December 31, 2010, ANEWrx paid Physician 1 one payment by check written directly to Physician 1 in the amount of $6,845.33 and three payments by check to Physician 1's health center totaling $25,395.50. In addition, Physician 1's health center's account at Dollar Bank received fourteen deposits from ANEWrx totaling $146,465.59. The payments were originally made to Physician 1 directly but were changed to the name of his health center at the request of

Physician 1.

        e.     It was further part of the conspiracy that ANEWrx provided Physician 1 with $3,060.00 worth of depo medrol injectable 80 mg dosages, a corticosteroid, on September 20, 2010, December 23, 2010, and January 21, 2010. SADOWSKI then subtracted the cost of this product from the payments ANEWrx made to Physician 1 for prescription referrals.

        f.     It was further part of the conspiracy that SADOWSKI received salary totaling approximately $493,249.10 from ANEWrx.

        g.     It was further part of the conspiracy that ANEWrx also maintained a business relationship with The Health and Rejuvenation Clinic aka Total Health and Rejuvenation Clinic (THARC), Palm Beach Life Extension (PBLE), The Longevity and Aesthetics Institute (L &A) and Physician 2 in Florida. THARC, PBLE and L &A represented approximately forty percent of ANEWrx business prior to March 21, 2011. SADOWSKI and Gavin knew that Physician 2 did not see clients of THARC or PBLE, but simply wrote the prescriptions for the clientele of these businesses. Typically, a consultant at THARC would receive a telephone call from a client requesting certain anabolic steroids and HGH. The consultant would then take the client's "order" and send it via facsimile to Physician 2. Physician 2 would write the prescription, without ever seeing the client, and send the prescription back to THARC. THARC then sent the prescription to ANEWrx via facsimile. THARC and ANEWrx had a price agreement for products.

        h.     It was further part of the conspiracy that ANEWrx had a buy/sell agreement with Pharmacist 1 and Applied Pharmacy in Mobile, Alabama. After Pharmacist 1 was indicted for illegal steroid distribution, he referred approximately twenty doctors to

ANEWrx to have prescriptions for, among other things, anabolic steroids and HGH filled. SADOWSKI agreed that ANEWrx would pay Pharmacist 1 a commission in return for the referral ANEWrx received from filling these prescriptions.

        i.    It was further part of the conspiracy that SADOWSKI and Gavin acquired a blood test prescription form from Physician 3. SADOWSKI and Gavin filled out these prescription forms to gauge current hormone levels for themselves, family members, and friends. After obtaining the blood test results, Gavin recommended an anabolic steroid/human growth hormone/bio-identical hormone regimen and the recommended products would be dispensed by ANEWrx to SADOWSKI, Gavin, friends and family members. At times, these prescriptions utilized Physician 3's name as the prescribing physician, even though Physician 3 did not personally examine any of these individuals or authorize the prescriptions.

        j.    It was further part of the conspiracy for Gavin to research different hormone replacement therapies for Gavin and ANEWrx. Gavin also reviewed many of the prescriptions that were sent in to ANEWrx to be filled and was aware that many physicians or clinics were prescribing anabolic steroids and HGH as part of a "stack." Gavin also answered client questions regarding how to use and administer the anabolic steroids and HGH.

k.      It was further part of the conspiracy for Gavin and SADOWSKI to obtain prescription medications from ANEWrx without prescriptions.

All in violation of Title 21, United States Code, Section 846.

ERIC H. HOLDER, JR.
Attorney General of the United States

By:    _____
       STEVEN M. DETTELBACH
       United States Attorney
       Northern District of Ohio
       Matthew B. Kall (3003738-NY)
       Carol M. Skutnik (0059704-OH)
       Special Assistant U.S. Attorneys for the Western District of Pennsylvania
       801 West Superior Avenue, Suite 400
       Cleveland, Ohio  44113-1852

Date:  October 16, 2012